Wanda **GLEZERMAN**, Trustee,
Appellant,

v.

**COLUMBIAN MUTUAL LIFE INSURANCE COMPANY; CMS Companies; Robert E. Spivak, individually, jointly, severally and/or in the alternative.**

No. 90–5818.

United States Court of Appeals,
Third Circuit.

Argued March 4, 1991.

Decided Sept. 10, 1991.

Charles I. Tighe, III (argued), Chatburn & Tighe, Mt. Laurel, N.J., for appellant.

Richard M. Eittreim (argued), McCarter & English, Newark, N.J., for Columbian Mut. Life Ins. Co.

Norman K. Zeiner (argued), Law Offices of Thomas Dempster, III, Mt. Laurel, N.J., for CMS Companies.

Frank A. Luchak (argued), Duane, Morris & Heckscher, Marlton, N.J., for Robert E. Spivak, et al.

Before BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Appellee, Robert Spivak ("Spivak"), is an insurance broker who handled the insurance needs of Benjamin and Wanda Glezerman for the period of approximately twenty years prior to Benjamin Glezerman's death. Benjamin Glezerman died on September 14, 1988. Prior to that date, Wanda Glezerman handled most of the communications regarding the policy at issue in this case.

The present litigation was brought by Wanda Glezerman, as trustee for her husband's estate, for damages based on appellee Columbian Mutual Life Insurance Company's ("Columbian") failure to pay death benefits on a Columbian policy sold to Benjamin Glezerman by Spivak. Wanda Glezerman is suing Spivak, CMS Companies ("CMS") (the firm that serviced the policy), and Columbian. The district court granted appellees' motion for summary judgment on the ground that the appellees owed no duty to Glezerman in the circumstances of this case. We affirm in part, vacate in part, and remand for further proceedings in accordance with this opinion.

## BACKGROUND

Spivak had a close affiliation with CMS. The Glezermans received letters signed by Spivak on CMS letterhead, and Wanda Glezerman testified that she thought Spivak was a partner in CMS. See Appendix ("App.") at 7. Spivak acknowledged that he placed all his business with CMS, and that CMS provided all the servicing of Spivak's accounts. See id. at 8–9. Spivak's offices were in the same building as CMS, and he shared CMS staff. See id. at 9.

The life insurance policy at issue became effective on September 14, 1979. Each annual premium was set out in the policy. The premium increased from $9,313.20 in the first year to $37,026.60 in the twentieth year, see App. at 34, and was payable in two semiannual installments, one due in September and one due in March. For the year in question, the annual premium was

$18,064.80. The policy provided for a thirty-one day grace period in which the insured could pay the premium after the due date and still retain coverage. See App. at 29; see also N.J.S.A. § 17B:25–3 (mandating a minimum of thirty days as a grace period prior to cancellation of a life insurance policy). Finally, the policy provided terms for reinstatement in the event of cancellation for non-payment of premiums. In order to qualify for reinstatement, the insured was required to provide proof of insurability, and then pay all overdue premiums at 5% interest. See App. at 39.

For purposes of summary judgment, the following facts concerning the relationship between the Glezermans and Spivak are taken as true. Columbian sent premium statements to CMS, not the Glezermans. See App. at 20. There was no set procedure for the Glezermans to follow when making premium payments. Premiums were occasionally paid to Spivak's office, and occasionally to Columbian. On some occasions, CMS paid the premium, billing the Glezermans later. See App. at 15. One of the premiums paid by CMS was $15,000. Further, the amount in the premium statement was not always the amount actually due, because Spivak advised the Glezermans to occasionally borrow against their policies to make premium payments. See App. at 14. Spivak also told the Glezermans from which of their financial accounts to pay the premium. See Supplemental Appendix ("Supp.App.") at 23–24.

Finally, because each premium payment represented a large sum of money, the Glezermans had established a special procedure wherein CMS would notify them as the grace period drew to a close so that they could pay at the very last minute. The servicing department of CMS monitored the Glezermans' premium payments. Spivak acknowledges this procedure was agreed to and followed by appellees. See App. at 20, 23. As Wanda Glezerman described it:

From the beginning of time, I always got the notice from [Spivak] first and then he would catch up with the grace period and they will tell me when to send the check

and how much to send, whether there was a difference or there wasn't [in the amount owed from the amount on the statement] and from what account to pay it.

Supp.App. 71–72.

In the spring of 1986, the Glezermans received notification from Columbian, via CMS, indicating that the premium on Benjamin Glezerman's life insurance policy was due. *See* Supp.App. at 22. That notification specified both the due date for the premium payment, and the end of the grace period. *See* Supp.App. at 118.[1] Soon thereafter, Spivak telephoned Wanda Glezerman and discussed the payment with her. Spivak told Glezerman not to worry about the payment because she still had time to pay. *See* App. at 45. The next communication the Glezermans received notified them that the policy had lapsed. *See* App. at 84.

CMS and Spivak had received notice that the Glezermans' policy had lapsed from Columbian shortly after the end of the grace period. That notice included a late payment offer to bring the policy back into force. *See* App. at 46. Apparently no action was taken pursuant to this notice, and there is no evidence in the record as to whether the Glezermans were informed of Columbian's late payment offer.

On May 6, Wanda Glezerman sent two checks that had been previously prepared in anticipation of April 14, the end of the grace period. *See* Supp.App. at 132. Per the instructions of a CMS employee, these checks were back dated to the last day of the grace period, although they were actually written on May 6. Wanda Glezerman was told that the policy would be reinstated. *See* App. at 48. Instead of automatically reinstating the policy, however, Columbian required the Glezermans to file a request for reinstatement, and a medical form to be completed with reference to Benjamin Glezerman.

Also in the beginning of May, Spivak contacted the general agent at Columbian and tried to get the policy reinstated. *See* App. at 51. CMS employees originally gave Spivak a reason to believe that Columbian was prepared to reinstate the policy without further medical evidence, *see id.* at 52, but by the end of May or the beginning of June, Spivak knew that Columbian did not want to reinstate the policy because of medical reasons. *See id.* at 53. On June 9, 1986, Spivak wrote to the Glezermans and told them that Columbian had reinstated the policy. *See id.* at 54. Spivak now admits that the policy was never reinstated after the lapse in March. The premium checks that Wanda Glezerman sent to Columbian on May 6, were returned by Columbian to CMS in July of 1986, and from CMS to the Glezermans in October of 1986. *See* App. 60–62.

The only replacement policies that the Glezermans were able to purchase were those that conditioned payment of death benefits on the insured surviving a certain period of time. Benjamin Glezerman died on September 14, 1988, prior to the end of the stated period necessary to make the replacement policies effective. His estate received only the premiums that had been paid on the replacement policies.

## DISCUSSION

### A. *Duty Owed by Broker to Client*

Wanda Glezerman argues that during their long term relationship Spivak assumed responsibilities, in addition to those normally associated with the client-broker relationship, from which a legal duty arose. Under New Jersey law,

> one who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain the insurance, the law holds him to the skill, care and diligence in the execution of his commission.... If he neglects to procure the insurance or if the policy is materially deficient ... because of his failure to exercise the requisite skill or diligence, he becomes liable.

*Rider v. Lynch*, 42 N.J. 465, 201 A.2d 561, 567 (1964); *see Sobotor v. Prudential*

---

1. This document is not in the record.

*Property & Cas. Ins. Co.*, 200 N.J.Super. 333, 491 A.2d 737, 739 (App.Div.1984) (a broker owes to those engaging its services reasonable skill, care and diligence); *Avery v. Arthur E. Armitage Agency*, 242 N.J.Super. 293, 576 A.2d 907, 910 (App.Div. 1990); *Johnson v. Mac Millan*, 233 N.J.Super. 56, 558 A.2d 24, 26 (App.Div.1989). This duty is clearly breached when a broker fails to procure a policy he promised, when the broker assures that there is coverage when there is not, or when the broker procures a deficient policy. The New Jersey Supreme Court, however, has held that, "[w]e do not read the case as limiting the establishing of a broker's liability to these three circumstances, and as is apparent from today's decision, we would not impose any such limitation." *Bates v. Gambino*, 72 N.J. 219, 370 A.2d 10, 14 n. 2 (1977).

Insurance brokers are held to a high standard by New Jersey courts:

> It is not necessary for the client in order to establish a breach of duty to prove that he laid out for the broker the elements of a contract of insurance. It is sufficient to show that he authorized procurement of the insurance needed to cover the risks indicated and that the broker agreed to do so but failed or neglected to perform his duty. Moreover, if the broker agrees to try to obtain or to try to obtain the coverage he knows or should know the principal seeks, and he finds that he cannot procure it, he is bound to notify the principal of that fact with reasonable dispatch.

*Rider*, 201 A.2d at 567.

Spivak argues that he did not breach the duty imposed by New Jersey because the Glezermans received a premium notice which indicated the day the premium was due. Spivak contends that the New Jersey Superior Court holding in *Insinga v. Hege-*

*dus*, 231 N.J.Super. 562, 555 A.2d 1183 (1989), precludes Wanda Glezerman's claim. In *Insinga*, the court held that an insured could not collect under an expired policy, where the policy lapsed because of the insured's "own action and not by any inaction of the insurer." *Id.* 555 A.2d at 1186. *Insinga* is clearly distinguishable from the present case, however, because the insured there voluntarily and deliberately decided not to renew the policy. *See id.*

In addition, mere non-renewal is insufficient to preclude an insured's claim. In the seminal case discussing brokers' and agents' duty to clients, *Rider*, the New Jersey Supreme Court stated:

> In passing it should be said that the failure of [the insureds] to read the policy will not estop either of them from prosecuting a cause of action in negligence.... Nor will such a failure support a defense of contributory negligence. In view of the relationship of principal and agent ... [the insureds] were entitled to rely upon and believe that the broker had fulfilled his undertaking....

201 A.2d at 570. Accordingly, the fact that the Glezermans received a premium notice prior to the expiration of the policy is not dispositive of this case.

Spivak argues that the basis of the duty owed by a broker to a client is the specialized knowledge required to handle complex insurance agreements.[2] Spivak is only partially correct. While it is true that specialized knowledge is part of the rationale for imposing a duty on insurance brokers, New Jersey caselaw does not support the conclusion that professional training is the primary basis for such a duty.

An insurance agent may assume duties in addition to those normally associated with the agent-insured relationship, and

---

**2.** For example, in *Walker v. Atlantic Chrysler Plymouth, Inc.*, 216 N.J.Super. 255, 523 A.2d 665 (App.Div.1987), the Appellate Division noted [O]ur holding in *Sobotor* [*v. Prudential Property & Cas. Ins. Co.*, 200 N.J.Super. 333, 491 A.2d 737 (A.D.1984)] recognized that insurance professionals, "[b]ecause of the increasing complexity of the insurance industry and the specialized knowledge required to under-

stand all of its intricacies ...," often stand in a fiduciary capacity to the client and "should be required to use their expertise with every client...." This duty was found to exist notwithstanding the fact that it was "not clear whether plaintiff told [the agent] that he wanted to be fully covered...." *Id.* 523 A.2d at 668 (citations omitted).

New Jersey courts regularly review the record for evidence of greater responsibilities. *See, e.g., Sobotor,* 491 A.2d at 740 ("The record does not indicate that defendant ... expressly contracted to assume additional duties."); *see also Citta v. Camden Fire Insurance Assoc. Inc.,* 152 N.J.Super. 76, 377 A.2d 779, 779–80 (App. Div.1977) ("[N]o arrangement, custom or course of dealing between plaintiffs and the company, other than the ordinary insurer-insured relationship, is anywhere suggested and we are convinced there was no other.") (superseded by N.J.A.C. 11:1–5.5, which requires notification of pending expiration of fire insurance). The prior conduct of and length of relationship between the parties can create or negate the existence and scope of the duty owed to the insured. *See Sobotor,* 491 A.2d at 740–41; *Dimarino v. Wishkin,* 195 N.J.Super. 390, 479 A.2d 444, 445–46 (App.Div.1984) (relationship between broker and insured affects scope of duty); *Bruni v. Prudential Insurance Co. of America,* 51 N.J. 408, 241 A.2d 449, 461 (1968) (reversing directed verdict because factual questions remained concerning "the course of conduct between the parties").

As these judicial investigations into the parties' relationship indicate, the client must establish "something more" than a broker-client relationship in order to impose a heightened standard of care on a broker. *See Avery,* 576 A.2d at 910 (noting that "[i]n every case but one since *Rider* was decided, the customer has initiated some contact with the broker concerning either the procurement or renewal of coverage."); *see also Sobotor,* 491 A.2d at 739 ("[A] duty arises when there is a special relationship between the insurance agent and the client which indicates reliance by the client on the agent."). As discussed in *Avery,* "a broker's liability has turned on whether the broker's conduct invited reliance, or the client's conduct exhibited or justified a claim of reliance." 576 A.2d at 911; *cf. Walker,* 523 A.2d at 668 (holding that an insured's demonstrated reliance on a broker's specialized professional knowledge may permit a jury to find that the broker had a duty to inform his client of alternative coverage).

Wanda Glezerman has established a disputed issue of material fact concerning the scope of the duty owed her by Spivak. Under the standard for summary judgment, we accept as true her assertion that she relied on Spivak to tell her when, how much, and from which account to make a premium payment. Spivak also admits that he had set up a procedure at CMS, wherein CMS would monitor the account, thereby permitting the Glezermans to make their payment as late as possible. Finally, the month before the premium was due, Spivak told Wanda Glezerman that she had time to pay Columbian and that she should not worry about it. These allegations, if true, establish the "something more" required by New Jersey law that creates additional responsibilities on the part of the broker. *See, e.g., Insinga,* 555 A.2d at 1185. (holding that the question of reliance may appropriately be submitted to the trier of fact).

Once a duty has been established under the facts of the case, the question presented on summary judgment is "whether reasonable minds could differ on the facts presented to the motion judge as to whether the duty owed was breached. If reasonable minds could differ on the answer, a plenary trial is necessary and summary judgment cannot be entered." *Avery,* 576 A.2d at 912. The duty may be breached both by acts of commission and by acts of omission; New Jersey courts do not distinguish between the two. *See Sobotor,* 491 A.2d at 741. Accordingly, if Spivak did owe the Glezermans the duty asserted, his failure to arrange for payment could constitute a breach.

We do not here decide the question of whether Spivak owed a duty to the Glezermans. The only instances where brokers have been liable as a matter of law have been where they have been ignorant of available coverage, or have failed to obtain requested coverage, or have failed to advise the client of unavailability of requested coverage. *See Avery,* 576 A.2d at 912. "Except in the clearest of cases we believe

these intricate issues concerning the breach of a broker's duty to an insured should be resolved in a plenary trial." *Id.* at 916.

In *Rider*, the New Jersey Supreme Court cited with approval *Barton v. Marlow*, 47 N.J.Super. 255, 135 A.2d 670 (App.Div. 1957). As characterized by *Rider*, in *Barton* the insured asked about his car insurance in May or June, and the insurance broker told him that he was "covered." Two months later, the insured was in an accident, and the insurance company denied coverage. When the insured sued the broker, the trial court dismissed for contributory negligence and lack of proof of negligence. The appellate division reversed, holding, *inter alia*, "[t]he jury could have concluded that if there was a prior cancellation of the policy, exercise of reasonable attention to the matter on defendant's part would have apprised him of that fact, and that *if he could not then get the policy reinstated,* due diligence would have led him to notify the plaintiff...." *Rider,* 201 A.2d at 568 (quoting *Barton,* 135 A.2d at 672) (emphasis added). In the case of the Glezermans, prompt notification from CMS or Spivak that the policy had lapsed would have provided them with the opportunity to take advantage of the "late payment offer." App. at 46.

Similarly, in *Auger v. Gionti Agency,* 218 N.J.Super. 360, 527 A.2d 928 (App.Div. 1987), *appeal dismissed,* 113 N.J. 348, 550 A.2d 459 (1988), the insured received a notice from the insurance company in April stating that if the premium was not paid by May 11, the insured's car insurance would be canceled. The insured called her broker, who told her that he would need the premium a couple of days before May 11. The insured "always 'depended on' [the broker] for advice concerning insurance problems." *Id.* 527 A.2d at 930. The premium was hand delivered to the broker on May 8 (according to the insured) or May 10 (according to the broker). The broker mailed the premium to the insurance company on May 10, but did nothing to inform the insurer of receipt of the premium. Because the premium was not received by the insurer until May 12, the policy lapsed and the insurer then refused to reinstate. The broker attempted to have the policy reinstated, but was unable to convince the insurer to do so. The court concluded that a directed verdict against the broker was appropriate. *See id.* 527 A.2d at 931.[3]

### B. Negligent Misrepresentation

■ On June 9, 1986, Spivak wrote to the Glezermans and told them that the Columbian policy was in full force and effect. *See* App. at 54.[4] As noted above, Spivak now admits that the policy has not been in effect since the lapse. Wanda Glezerman argues, relying on *Auger v. Gionti,* that because Spivak is an insurance broker who had a long standing relationship with the Glezermans, his representation that coverage was in effect when in fact it was not should be considered negligence "as a matter of law and the only thing for the jury to determine is the

---

**3.** In that case, summary judgment in favor of the insurer was not warranted because there was no evidence that the insurer acted promptly and reasonably, and also because of some deposition testimony of the broker to the effect that the refusal to reinstate was not prompt. *See id.* 527 A.2d at 932–33.

**4.** Wanda Glezerman does not argue that either Spivak or CMS were agents of Columbian. Indeed the facts do not support such a contention. Accordingly, their alleged negligence may not be attributed to Columbian. *See Avery,* 576 A.2d at 917; *Johnson,* 558 A.2d at 27. The lack of an agency relationship between Spivak, or CMS, and Columbian is important because an insurer may be bound by the statement of any agent, even if the statement is erroneous. *See Lilly v. Allstate Insurance Co.,* 218 N.J.Super.

313, 527 A.2d 903, 907 (App.Div.1987). As the Supreme Court of New Jersey recently held:

> Both agents and brokers are obliged to inform insured of available coverage. Agents, like brokers, are obligated to exercise good faith and reasonable skill in advising insureds.
>
> Because of their different roles, however, the remedy differs for breach of their duty to disclose.... So separate are the broker and insurer that when the insured recovers against the broker, the broker may not obtain indemnification from the insurer.

*Weinisch v. Sawyer,* 123 N.J. 333, 587 A.2d 615, 618 (1991). Because Spivak was not an agent of Columbian, Spivak's statement to the Glezermans that the policy had been reinstated may not be attributed to Columbian.

amount of damages." Appellant's Opening Brief at 8. Wanda Glezerman's reliance on *Auger,* is misplaced. In that case the loss occurred while the plaintiff was under the misimpression that the policy was still in effect, and thus relied to her detriment. In the matter at hand, Benjamin Glezerman died months after the misrepresentation was discovered. At the time of Benjamin Glezerman's death, Wanda Glezerman knew that the Columbian policy was not in force, and therefore, after she had knowledge that the policy was not in force, she could not have detrimentally relied on Spivak's representation.

Where the insured reasonably believes he is covered by virtue of representations by an insurance agent or broker, "the failure of the broker to produce the coverage or else warn the client at once that coverage could not be obtained constitutes a failure to exercise the requisite skill or diligence required of a broker to the same extent as would have obtained had there been a failure to issue a policy which the broker promised to procure." *Dimarino,* 479 A.2d at 446. Detrimental reliance is a key ingredient to this claim. In *Dimarino,* the insured would have had the opportunity to obtain alternative coverage, *but for* the representation of the broker. *Cf. Carlsen v. Masters Mates & Pilots Pension Plan Trust Fund,* 80 N.J. 334, 403 A.2d 880, 882–83 (1979) (holding that detrimental reliance is an element of a cause of action based on equitable estoppel); *Harr v. Allstate Insurance Co.,* 54 N.J. 287, 255 A.2d 208, 219 (1969) (holding that detrimental reliance is an element of equitable estoppel where the insurance company misrepresents the existence of coverage). The Glezermans had the opportunity to obtain alternative coverage.

Wanda Glezerman's argument may also be construed as one of "waiver." The doctrine of waiver is available to insureds. A waiver

> is predicated upon acts or conduct of the insurer with knowledge of the breach tending to show a recognition of the policy, or an intent to relinquish the right to declare a forfeiture for the known breach.... [I]t is always open to the

assured to show a waiver of policy provisions when the conduct of the insurer gives reasonable ground to the assured, as a layman ... to believe that such a forfeiture will not be incurred and the assured relies thereon to his prejudice.

*Bruni v. Prudential Insurance Co.,* 51 N.J. 408, 241 A.2d 449, 460 (1968).

The waiver of immunity on the policy must be intentional. An agent who furnishes a proof of claim which is immediately signed by the plaintiff, "with no attendant trouble, delay or expense on her part, or prejudice to her, represent circumstances which must, as a matter of law, be deemed insufficient to constitute a waiver by the company." *Feder v. Bankers National Life Insurance Co.,* 100 N.J.Super. 458, 242 A.2d 632, 634 (App.Div.1968), *certif. denied,* 52 N.J. 164, 244 A.2d 296 (1968). There is no evidence of record indicating that either Spivak or CMS had the authority to waive the requirements for reinstatement of the Columbian policy.

### C. Vicarious Liability of CMS

Glezerman asks this court hold hold CMS liable on an agency theory. Appellant makes a number of factual assertions intended to establish a principal-agent relationship between CMS, as principal, on the one hand, and Spivak, as agent, on the other. Factual issues concerning the liability of CMS under an agency theory were not discussed or resolved by the district court because that court granted Spivak's motion for summary judgment on the basis that he owed no duty to the Glezermans under the circumstances of this case. We will remand this issue to the district court for that court to determine in the first instance whether the appellant has created a triable issue of fact as to this issue.

### D. Liability of Columbian

■ An insurer has a reasonable amount of time in which to demand proof of insurability and then decide whether to reinstate. If the insurer affords the insured a reasonable opportunity in which to comply, the insured's response is a condition precedent

for reinstatement. If these conditions are met, mere payment of the premium is insufficient for reinstatement; the insured must submit evidence of insurability. *See, e.g., Volis v. Puritan Life Insurance Co.,* 548 F.2d 895, 902 (10th Cir.1977) (Colorado law); *Smith v. Pacific Mutual Life Insurance Co.,* 192 F.2d 248, 251 (6th Cir.1951) (Kentucky law). The only exception is waiver on the part of, or estoppel against, the insurance company. *See Volis,* 548 F.2d at 903. In the case of Benjamin Glezerman, the Glezermans submitted the application for reinstatement on May 23, 1986. After reviewing the medical records, the application for reinstatement was denied on July 29, 1986. *See* App. at 60.

■ Under Pennsylvania law, for example, the reinstatement provision contemplates the making of a new contract between the parties. The insurance company is not required to reinstate absent evidence of insurability. *Hogan v. John Hancock Mutual Life Insurance Co.,* 195 F.2d 834, 837 (3d Cir.1952). However, retaining an overdue premium for an extended period of time is evidence that a policy has been reinstated. The benchmark for determining a reasonable period may be a period specified by the insurance contract. *See id.* at 838. In *Hogan,* the policy gave the insurance company sixty days within which to act, and it did so. The reinstatement provision in the Glezermans' policy did not specify the period in which Columbian had to evaluate the insurability of the applicant. Columbian did respond in just over sixty days, however.

There is no evidence in the record that Columbian acted in a dilatory or even lackadaisical manner. We therefore hold that Columbian acted within a reasonable period of time in responding to the Glezermans' application.

■ Where the insurer receives the premium and then reinstates the policy, it becomes bound to its representation of coverage despite the fact that the representation was unauthorized conduct on the part of the agent. *See Jerry V. Carbone, Inc. v. North River Insurance Co.,* 207 N.J.Super. 12, 503 A.2d 885 (App.Div.1986); *see*

*also supra* note 4. A CMS employee allegedly told Wanda Glezerman that all that needed to be done for Columbian to reinstate the policy was to submit the reinstatement application and the medical form. *See* App. at 49–50.

This argument fails for the same reason that the negligent misrepresentation claim against Spivak failed. Namely, the Glezermans cannot demonstrate detrimental reliance on any alleged representation. Wanda Glezerman has not alleged that she would have been able to get alternative coverage before her husband died, but for the representations of Columbian. The other insurance companies she approached told her exactly what Columbian did: at that time, Benjamin Glezerman was not insurable.

■ Wanda Glezerman's final argument is that Columbian's failure to reinstate the policy based on its determination of insurability was erroneous. The Glezermans contend that the member of the insurer's underwriting department who performed the assessment was not qualified to do so. The Glezermans further contend that the insurance company is required to have a medical doctor at least review the records, if not perform a medical examination, prior to denying reinstatement.

The underwriter was not a medical doctor, but was able to determine from the medical records that Benjamin Glezerman had suffered from one myocardial infarction since the policy was issued, and had also developed a new left bundle branch block pattern on his electrocardiogram. Columbian argues that there is no requirement that a physician make the insurability determination.

Neither party cites precedent which delineates the requirements that an insurer must comply with in order to properly determine whether a particular applicant is entitled to reinstatement. The applicable New Jersey statute does not specify a procedure for the company to follow in addressing the insurability question: "the policy will be reinstated at any time within 3 years … upon written application there-

for, the production of evidence of insurability satisfactory to the insurer...." N.J.Stat.Ann. § 17B:25–9. The policy increases the statutory reinstatement period from three to five years, but conditions reinstatement "upon evidence of insurability satisfactory to the Company...." App. at 29. Given that the Glezermans could find no other insurer to provide full coverage in the two years from the cancellation of the policy until the death of Benjamin Glezerman, we cannot say that Columbian acted unreasonably. *Cf. Fisher v. American National Insurance Co.*, 241 F.2d 175, 178 (3d Cir.1957) (holding that under Pennsylvania law, mere mailing of the reinstatement application was insufficient to obligate the insurer to bring the policy back into force).

Further, New Jersey has adopted the view that the reinstatement clause of an insurance policy contemplates a new contract of insurance. *See New York Life Insurance Co. v. Weiss*, 133 N.J.Eq. 375, 32 A.2d 341, 342 (1943); *accord Feder v. Bankers National Life Insurance Co.*, 96 N.J.Super. 483, 233 A.2d 395, 397 (Law Div.1967); *cf. Feder v. Bankers National Life Insurance Co.*, 100 N.J.Super. 458, 242 A.2d 632, 634 (App.Div.1968) ("the agreement to reinstate is, in a sense, a separate undertaking"). Accordingly, the reinstatement application should be treated in the same way as an original, or new, application for coverage. Wanda Glezerman has not pointed to any evidence of record concerning the procedures used by Columbian when evaluating new life insurance applications. Because of this lack of evidence, we will affirm the district court's grant to summary judgment on this count. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (holding that summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.").

## CONCLUSION

We will affirm the district court's grant of summary judgment as it relates to Co-

lumbian, and vacate that portion of the district court's order granting Spivak's and CMS' motions for summary judgment. Concerning Spivak, New Jersey law recognizes a broader duty owed an insured by a broker than was recognized by the district court. We hold that the district court erred when it concluded that "based on public policy considerations, we find that even if Mr. Spivak had developed a custom or practice of reminding plaintiff that the grace period was about to expire, he had no legal duty to provide such notice." Indeed, it is just such a custom or practice that would give rise to a legal duty to provide notice of the end of the grace period. Turning to CMS, the district court should determine in the first instance whether Wanda Glezerman has created a triable issue of fact concerning CMS' liability. Wanda Glezerman's claims against Columbian should not survive summary judgment, and we will affirm the district court's judgment in that regard. We will remand this case to the district court for further proceedings in accordance with this opinion.